# Jermyn *v.* McClure.

195  245
29 SC ¹309

*Statute of frauds—Parol exchange of land—Evidence.*

A parol exchange of land like a parol sale must be established by clear, precise and indubitable evidence, but this means no more than that there must be precision in the terms of the agreement set up, and that the evidence to support it must be of a high order, carrying conviction to a moral certainty of its truth; absolute certainty is not required. A mere conflict in the testimony is not enough to condemn it, provided that out of all of it, the facts relied upon emerge with reasonable distinctness and certainty.

Where the evidence of an exchange of all the coal on one side of a creek for all of the coal on the other side is clear and precise, it is error to refuse to enforce the exchange on the ground that the lands alleged to have been exchanged were not sufficiently defined. The creek is a fixed natural boundary between .the lands, and the other boundaries take care of themselves.

A parol exchange of coal land established otherwise by clear and pre-

cise evidence, will not be defeated by a supposed inequality deduced from the fact that one tract contained 100 acres while the other tract contained only seventeen acres, where it appears that the surface acreage did not correctly represent the coal acreage, and that the condition and quality of the coal in the two tracts were different.

*Statute of frauds—Parol exchange of land—Consummation of agreement.*

An agreement for the exchange of land is within the statute of frauds and should be in writing, but the specific execution of a parol agreement for an exchange will be decreed in equity the same as a parol sale, where it has been so far executed as to make its rescission inequitable.

If the evidence shows a clear, unequivocal and complete taking possession of one of the subjects of an exchange by the party owning the other, it strengthens the evidence of a possession taken by the opposite party of the corresponding subject. Evidence of possession that might seem weak and inconclusive in the case of a parol sale, is thus made clear and convincing in the case of an exchange.

Argued Feb. 19, 1900. Appeal, No. 59, Jan. T., 1899, by plaintiffs, from decree of C..P. Lackawanna Co., June T., 1893, No. 6, dismissing bill in equity in suit of John Jermyn and Joseph J. Jermyn, copartners, trading as Jermyn & Co., v. Elliott, McClure & Co. Before Green, C. J., McCollum, Mitchell, Dean and Fell, JJ. Affirmed.

Bill in equity for an injunction to restrain the mining of coal, and for a decree for value of coal taken and penalty.

The facts appear by the opinion of Archbald, P. J., which was in part as follows:

The defendants claim that they were not trespassing but that they mined this coal by right through a parol exchange duly agreed to and executed by which they were to have all of the plaintiffs' coal north and west of a stream which runs across this territory called St. John's Brook, while the plaintiffs were to have all that belonged to the defendants south and east of it. The master, while conceding that the weight of the evidence is in favor of this contention, is of the opinion that it is not established so clearly and indubitably as to take the case out of the operation of the statute of frauds and perjuries. He has reviewed the evidence and given his reasons and we are thus able to follow him and judge of the value of his conclusions.

It is undoubtedly the law that a parol exchange of land like

a parol sale must be established by clear, precise and indubitable evidence, but this means no more than that there must be precision in the terms of the agreement set up and that the evidence to support it must be of a high order carrying conviction to a moral certainty of its truth. Absolute certainty is not required: Spencer v. Colt, 89 Pa. 314; Ott v. Oyer, 106 Pa. 14. " What is meant by indubitable proof . . . . is evidence that is not only found to be credible but of such weight and directness as to make out the facts alleged beyond a reasonable doubt:" Boyertown National Bank v. Hartman, 147 Pa. 558. A mere conflict in the testimony is not enough to condemn it, provided that out of all of it the facts relied upon emerge with reasonable distinctness and certainty.

In order to properly judge of the evidence in the present instance, a brief statement of the circumstances existing at the time of the alleged parol exchange is necessary. The defendants, Elliot, McClure & Company, for a number of years prior to 1887, were lessees upon royalty of a body of coal lands some 250 acres in extent, in Old Forge township, in this county, composed of the Erastus Smith and a few acres of the H. H. Winters tract. They were also the lessees of the surface and a certain part of the coal upon thirty-two acres to the northeast of this on which they had located a shaft and breaker known as the Sibley colliery, and had mined the refrom more or less of the coal lying to the northwest in the direction of the outcrop, and also to the south and southwest towards an anticlinal axis in the measures existing in that direction. The party under whom they held and to whom they were answerable for royalties was the Pennsylvania Anthracite Coal Company, which company also held by lease other coal lands adjoining to the north, east and south, including the Michael Tedrick, 128 acres, the C. B. Drake, fifty acres, and about eighty-two acres of the H. H. Winters tract. About twenty acres of the Drake tract were embraced in the thirty-two-acre tract above spoken of under lease to the defendants. Mining operations on some portions of these tracts were conducted by that company from a colliery known as the Dunn shaft located near the extreme easterly corner of the lands of Elliot, McClure & Company.

In the early fall of 1886, the Pennsylvania Anthracite Coal Company was sold out by the sheriff on foreclosure proceedings

and its holdings were purchased by its bondholders, who organized the New York, Susquehanna and Western Coal Company, and transferred their title to it, so that this company, from that time on, were both the lessors of Elliot, McClure & Company and owners of the coal adjoining and encircling that firm to the north, the northeast and the east.    Of both the Pennsylvania Anthracite while it existed and the New York, Susquehanna and Western Coal Company, succeeding it, John Jermyn was the general manager, and in that capacity had supervision over the general course of mining of Elliot, McClure & Company, and received and receipted for the coal royalties for which they were answerable.

For a number of years prior to the time with which we are concerned Elliot, McClure & Company had not themselves operated the Sibley colliery, but had sublet it on a royalty of seven and one half cents to the Pennsylvania Anthracite Coal Company, and it has been run by that company under the immediate superintendence of Mr. Jermyn as general manager. Early in 1885, however, Jermyn threw up the lease and said that his company could not go on with it, and Elliot, McClure & Company were forced to resume possession and again take up their mining operations.

This was the situation when in the fall of 1886 the subject of an exchange of coal was first mooted.    That an exchange of some kind was discussed and agreed to in which Elliot, McClure & Company participated is not in controversy; the only question is as to what it embraced.

The Michael Tedrick tract is broken into and the upper part of it divided by a small piece of land of about thirty-six acres, which was owned by the Delaware, Lackawanna & Western Railroad, who were also the owners to the northeast of a large and compact body of coal, but were cut off from the thirty-six acres by one of the arms of the Tedrick.    This condition invited readjustment of things by which the thirty-six-acre piece could be thrown into conjunction with the general lands of the New York, Susquehanna and Western Coal Company, and be made up to the Delaware, Lackawanan & Western Railroad, by an equal acreage taken from the Tedrick immediately adjoining the other property.    The desirabilty of such an arrangement was perceived by Mr. McClure in the course of his mining opera-

tions and he brought it to the attention of Mr. Jermyn some time in the fall of 1886, at the time suggesting that his firm would undertake to mine the coal so exchanged. Later on the matter was laid before Mr. Potts, the president of the New York, Susquehanna and Western, Mr. Jermyn's superior, and was approved by him, and he undertook to bring about the proposed exchange. At this point the dispute between the parties before us as to what happened begins, and we shall have to take up and discuss the evidence.

It is to be observed that at this first interview between McClure and Jermyn the only exchange that could have been spoken of was of a part of the Tedrick for the thirty-six acres of the Delaware, Lackawanna & Western Railroad. Jermyn had not then leased the lands in dispute and they were all held by the New York, Susquehanna and Western, of which he was the general manager. But it was natural to discuss in that connection the effect of the exchange on the rest of the company's lands lying to the west and south of the Delaware, Lackawanna & Western tract which Mr. Jermyn in the interest of his company would of course be anxious to dispose of and which McClure states that he offered to mine. " There was a piece of coal," says he " that there was some difficulty in getting. Jermyn had worked up there . . . . up the mountain. As there was not a regular grade, neither was the grade steep enough to bring it down by a plane, it made it very difficult. The first time I talked to him, I told him if this could be secured, . . . . the Delaware, Lackawanna & Western tract, and all thrown together, we could bring the coal around (meaning, as he explains, that his firm would do so) ; that would end the difficulty."

The next discussion of the subject which McClure remembers with distinctness was somewhere about the middle of February, 1887, at Jermyn's office in Scranton, Mr. Potts being present. " I drew their attention," says he, " to this piece of coal lying well inside the property. Q. Lying east of the Delaware, Lackawanna & Western and above the road? A. Yes, sir. I said if . . . . the New York, Susquehanna and Western would make the exchange of coal we would agree to take all the coal out north or west of the St. John's Brook. . . . They said to trade and go ahead." At this conversation he made a small diagram

in pencil in a memorandum book showing the general lay of the land and illustrating his position. " The subject of our talk," as he tells us in another place, " was the coal lying north of Jermyn's (former) workings, . . . . upon the C. B. Drake and Tedrick and part of the Erastus Smith; that was the object of our discussion, the manner of getting it out. I stated how it could be done, and to show Mr. Potts I drew that rough draft of how it could be done. . . . I stated to them that that coal could only be got out by making an exchange here. . . . By pushing the coal line back and making the exchange with the Delaware, Lackawanna & Western, and that would give us access to this coal lying up under the mountain. Q. How would that give you access? A. Because Jermyn, when he had possession of our breaker for the Pennsylvania Anthracite, had mined up to a point where he could not go any further." " The men were both pleased," says he, " and said they would make the exchange. "

There can be no question as to the happening of these preliminary meetings and conversations, nor in part at least as to the subject of them. Not only have they an inherent probability of truth and are told by McClure with a detail which itself carries conviction, but Jermyn himself admits them, confining them, however, to the Delaware, Lackawanna & Western tract. Let us quote a little from his testimony: " Mr. McClure, he wanted to get an exchange. We talked the matter over with him, both Mr. McClure, Mr. Potts and myself, so that in making the exchange the Delaware, Lackawanna & Western gave McClure the business of furnishing coal to them, which he got from Potts. Mr. Potts saw afterwards that that was carried out." He fixes this as four or five months before he got his lease from the New York, Susquehanna and Western, which was secured in March, 1887, and as having occurred at his office in Scranton the same as McClure, and states that nothing had been said at that time about his taking a lease; also that the first conversation with McClure was a considerable time still before this, coinciding in all this with Mr. McClure. " Q. After acquiring the lease from the Susquehanna people didn't you say to McClure, 'Now I will have to make the exchange rather than the Susquehanna,' because you were the lessor and owner? A. Yes, sir. Q. That was made by parol or word of mouth,

wasn't it?   A. Yes, sir. . . . I didn't act for the Susquehanna
Coal Company.   I acted for myself.   Me and Mr. McClure
talked the matter over with Mr. Potts.   I did the business.   I
got the Delaware, Lackawanna & Western piece of land for Mc-
Clure, and after he (Potts) died I owned (to) the contract, and
after it was made out carried it out. . . . I had no business to,
and ought not to have done it; I am very sorry I did now.
Q. Now, Mr. Jermyn, why was it you gave him forty acres of
the vein of coal on this side of the creek, if anything?   A. Be-
cause we talked the matter over and I wanted to keep my word;
I done as I considered right and gave him that piece of coal so
as to make the exchange with the Delaware, Lackawanna &
Western.   Then I think I took the lease."   He denies, how-
ever, that anything was said at any time about the other coal
now claimed by the defendants.

It is established then by this evidence that early in 1887, be-
fore the rights of Jermyn & Company had in any way attached,
it was agreed by Potts, president, and Jermyn, general manager,
of the New York, Susquehanna and Western Coal Company,
whose authority in the premises is not questioned on the one
side, and McClure, speaking for his firm, on the other, that the
coal on the Delaware, Lackawanna & Western track should be
obtained from that company by an exchange of part of the
Tedrick, and that Elliot, McClure & Company should mine it.
This exchange was consummated between the two companies
by a written agreement May 1, 1887, and Jermyn & Company
in the meantime by lease of March 1, 1887, having acquired all
the lands of the New York, Susquehanna and Western not
already leased to Elliot, McClure & Company, and the exchange
having disposed of part of them, confirmed the previous arrange-
ment with McClure.   In doing so it was assumed by Jermyn
that he succeeded by virtue of his lease to the rights of the
New York, Susquehanna and Western Coal Company to the
Delaware, Lackawanna & Western coal, but there is no legal
basis for this assumption, nor is there anything in the case to
show that he has to-day any right to it, whether McClure &
Company have or not.   While the agreement as to this tract
between McClure and the Susquehanna Coal Company rests
in parol as well as the confirmation of it by Jermyn, yet having
been acted upon by the defendants and large outlays of money

made on the strength of it and possession having been taken by an extension of the mine workings into the coal which was the subject of it, equity would enforce it regardless of the assent of Jermyn & Company. But that assent having been given, however reluctantly, whatever it conveyed belongs to the defendants, and so far leaves nothing in the plaintiffs to recall or contend about.

Let this last point, however, be as it may, turning to the testimony of McClure as to what happened after Jermyn got his lease, he says: "Q. After the exchange with the Delaware, Lackawanna & Western you had another talk with Mr. Jermyn? A. Yes, sir. Q. How did you learn of the exchange with the Delaware, Lackawanna & Western? A. He told me. Q. What was the substance of that conversation? A. He said, 'You go ahead and take out the coal.' Q. Did he say he had completed the exchange with the Delaware, Lackawanna & Western? A. He said he had completed it. He said he had made the exchange. . . . Then I said, 'Mr. Jermyn,'—when I was about to leave—'and the understanding now is the creek is the line between us,' and he said, 'I so understand it.'" The date of this conversation is fixed as May 21, 1887, and the substance of it is repeated when the witness was again examined upon it.

We cannot agree with the master that this evidence is either indefinite, incomplete or insufficient to make out the parol exchange relied upon. According to the witness it was, as we have seen, the consummation of negotiations in which the feasibility of mining the New York, Susquehanna and Western lands north and northeast of the Sibley breaker had been thoroughly discussed and passed upon ; Jermyn when he ran the breaker for the Pennsylvania Anthracite Coal Company, the predecessor of the Susquehanna people, had tried it and failed; the acquisition of the Delaware, Lackawanna & Western track changed the situation and was intended to do so ; to reach this territory from the Dunn breaker an anticlinal axis had to be crossed in the coal measures, and a great deal of water encountered about at the point under the St. John's Brook, almost endangering the workings of all parties; this water and anticlinal was also a barrier to the McClure people as to such of their lands as lay south of the stream. All these considerations were present

as an inducement to the alleged arrangement, and are pursuasive of the probability of its having been made. The agreement by Potts and Jermyn before Jermyn had secured this lease, that McClure should have all this coal to mine if the exchange with the Delaware, Lackawanna & Western was effected, is a most important circumstance to bear in mind when we come to consider the effect of the alleged assent of Jermyn at the final interview. It takes but few words to make a bargain when it has all been talked over beforehand, so that if Jermyn said to McClure that he had completed the arrangement with the Delaware, Lackawanna & Western and that he (McClure) should go on and take out the coal, and that the understanding then was that the creek should be the line between them, this, in the light of the preceding negotiations, is as precise, complete and definite as anything by word of mouth ever is, or as in law or in equity it reasonably need be. A chancellor would find no difficulty in understanding and enforcing it. It is said, however, that Jermyn merely spoke of the Delaware, Lackawanna & Western exchange and when he said to go on and take out the coal he meant that coal and no other, and that McClure misunderstood him. But this loses sight of the fact that according to what McClure tells us the Delaware, Lackawanna & Western exchange was a mere incident; the mining of the other hung upon it requiring that it be first brought about in order to make the other feasible, but when that was effected it was the promised consequence; and when a party is told to go on and do what it has been arranged before that he should do in case a certain thing is accomplished we are bound to consider that that is what is referred to when he is told to do so. Moreover, looking at the probabilities, it is very difficult to understand why Jermyn would tell McClure to go on and mine the Delaware, Lackawanna & Western and not intend to include the Tedrick and Drake when by so doing he would interpose between his other operations and these two tracts, mine workings of McClure that would effectually cut him off from access, to them. He would be much more likely to do the reverse and reserve the Delaware, Lackawanna & Western coal if he had any idea of ever doing any mining in that territory.

But there is one thing that is conclusively against the sug-

gestion that the arrangement was confined to the Delaware,
Lackawanna & Western tract.    McClure says that as he was
about to leave he said to Mr. Jermyn: "Then the understand-
ing now is the creek is the line between us."    To which Jermyn
answered: "I so understand it."    This was not applicable to
the Delaware, Lackawanna & Western tract at all, which stops
at the back road and does not come within 1,000 feet of the
stream referred to.    The creek bounds on the southeast, the
thirty-two-acre piece which the defendants held under lease
and were mining, and also the twenty-one acres of the Tedrick
east of that and lying between the creek and the road.    The
creek also lies very close to the anticlinal axis, intervening
between the Dunn and the Sibley mines, on the southeast of
which McClure & Company encountered serious mining diffi-
culties, cutting them off from quite a body of their coal con-
tiguous to Jermyn's operations.    By referring to this natural
boundary on the surface, which corresponded also with natural
mining boundaries below, the idea that the Delaware, Lacka-
wanna & Western tract alone was the subject of the arrange-
ment is hardly possible.

And just here we may as well dispose of an objection raised
by the master that the lands alleged to have been exchanged
were not sufficiently defined.    "The boundaries ought to be so
fixed and certain by the terms of the contract that the land
could be set off as the parties intended it by a surveyor. . . .
One boundary and only one was mentioned in the final conver-
sation when it is alleged the exchange was made, and that was
St. John's Brook.    The plaintiffs' colliery was southeast of the
brook; the defendants' colliery was northwest of it.    Mr. Mc-
Clure says he had told Mr. Jermyn and Mr. Potts that if the
New York, Susquehanna and Western would make the exchange
of coal, his firm would agree to take all the coal out north or
west of the St. John's Brook. . . .    From all this the inference
seems plausible 'that it was meant the plaintiffs should take
all the defendants' coal southeast of the brook, and that the de-
fendants should receive in exchange all of the coal of the plain-
tiffs northwest of the brook; but parol contracts to be taken
out of the statute must be express and not implied."

We do not quarrel with the law of the learned master but
only with its application.    Here are parties having contiguous

mining territory lying as to both of them on opposite sides of a certain stream; negotiations leading to the extension of the mining operations of one of them carried on for some time, according to the story, are brought to a conclusion in which it is agreed that the creek shall be the boundary between the two; is there anything indefinite about that or anything left incomplete? Suppose two farmers had adjoining lands and took such a natural boundary as the basis of an exchange, would any court refuse to enforce it on the ground of its uncertainity? The other boundaries take care of themselves; it is the line between them that is the question, and nothing could be more definite for that purpose than a fixed natural boundary such as a stream of water crossing the territory dividing it. As we have pointed out this corresponded peculiarly in the case before us with certain mining obstacles below the surface which lends additional force to its adoption above and below, and we cannot doubt as to its efficiency for both. In Rounsley v. Jones, 2 Walker, 112, there was a reservation in a deed of "the iron ore banks which are on the west side" of the tract conveyed, and this was construed and enforced as a reservation of all the ore on the west of a line drawn through the center of the tract. If this was certain enough in a deed to define an exception taken out of the grant, we see no good reason why what is more than its equivalent should not be sufficient to fix the boundary of an exchange.

Quite an argument is sought to be made against the theory of an exchange because of the inequality of it. The defendants got 100 acres, says the plaintiffs' counsel, while the plaintiffs got but seventeen. It matters little as to this if that was the bargain, although the difference is, of course, a matter to be considered in weighing the probabilities. The inequality, however, is superficial rather than real. In the first place the surface acreage of these mountain tracts does not correctly represent the coal acreage below. This is materially reduced by the outcrop of the veins which occurs considerably before the northwest line of the tracts is reached. Nor is the condition and quality of the coal the same up the mountain as it is further down in the basin. Jermyn, when he was running the Sibley colliery, had tried to mine the greater part of this territory and had signally failed. The coal was poor in quality, hard to

clean and difficult to get at, and the company lost money on it. The acquisition of the Delaware, Lackawanna and Western coal somewhat changed the situation according to McClure's theory, and he was willing to try to mine it. He had the assent of both Potts and Jermyn to do so before Jermyn himself thought of becoming interested, and if that be so as to this part of the exchange, Jermyn merely confirmed what had already been agreed upon. No doubt he had the right to refuse, so far as concerned the Drake and Tedrick tracts, which were included in his lease, but to do so—according to McClure—would have been to fly in the face of what he as well as Potts had promised. Further than this it was shifting on to the shoulders of another what, according to his own experience, had proved practically worthless, and looking at it from that standpoint he might well have been glad to be rid of it. He thinks differently now, but that is not the question. As to the Delaware, Lackawanna and Western tract Jermyn, as we have seen, had no interest in it except by implication on account of an equivalent amount having been taken from him off the Tedrick tract to make the exchange; and whatever he had, had already been bargained away to McClure in connection with the arrangement for mining the lands beyond it to the west; while as to the thirty-two-acre piece where the Sibley colliery is located, the supplemental lease of 1872 allowed the lessees to mine to the anticlinal on the south carrying it practically to the brook in that direction. If these things be considered, the substantial exchange between Jermyn and McClure is narrowed down to the seventeen acres south of the brook for the twenty-one acres north of it, lying east of the thirty-two acre tract, and the coal under the one, according to the finding of the master, is just about equal to that under the other, doing away entirely with any idea of inequality.

[Another difficulty with the defendants' case, as the master conceives it, is that the terms of the exchange were not sufficiently defined, the theory being, as he says, that it was an even exchange which is an inference merely; the coal of both parties was subject to the payment of royalty, but not the same royalty, the one being twenty-five cents a ton and the other eight per cent of the price at Hoboken, and no adjustment of the difference having been made. We see no difficulty, however, on this

variance of the royalties. If there was an exchange of the coal held by lease on the one side and the other, the transfer would not be absolute but conditional. Each lease in all its terms was binding upon the coal it covered, and this applied as well to the royalty as to any of its provisions. Neither party exchanging could give to the other rights superior to those which he himself held. When, therefore, Jermyn came to mine McClure's seventeen acres he would have to pay the twenty-five cents royalty upon it and meet all the other obligations of that lease; and when McClure mined Jermyn's coal he would have to pay Jermyn's eight per cent royalty unless there was some different arrangement.] [3]

But the fact is that, according to McClure, there was an express arrangement as to the royalties both with Jermyn as well as with the New York, Susquehanna and Western. He states that in the talk with the former, in April, 1887, the royalties were spoken of; that Jermyn, quoting his counsel, Mr. Willard, said that McClure should pay royalty to the Delaware, Lackawanna & Western Railroad for the coal from that tract, and the Delaware, Lackawanna & Western pay to the New York, Susquehanna and Western when they took out the coal they got in exchange, and that as to the other tracts McClure & Company were to pay just what they had been paying before. In addition to this a conditional reduction in the royalty was secured later on by McClure from the New York, Susquehanna and Western people which Jermyn knew of and approved. He testifies that after the exchange somewhere about October 1, 1887, in company with his partner Sibley, he went with Jermyn to New York to see Potts about reducing the royalty on these tracts. It was explained to Potts that the coal in the second vein was so poor and so expensive to work that it could not be mined at a profit, and it was there in Jermyn's presence agreed that for the next five years when their coal brought them less than $1.90 a ton, according to the contract under which they were selling it, there should be a reduction of five cents a ton, making the royalty twenty cents instead of twenty-five. Jermyn does not deny this statement, and in fact substantially confirms it. He says: "Q. You remember that Mr. Potts directed you to make a reduction to the defendants in this case of five cents per ton royalty in the second vein because the prepared coal in that vein

brought less than $1.90 per ton; you remember that? A. I remember something of that kind. What it was—how much— I don't know." But that which puts it beyond controversy are the monthly statements furnished by McClure & Company to the New York, Susquehanna and Western, which have been put in evidence of the coal mined and royalties due thereon, and the payments by check made and accepted in accordance therewith. These statements went through Jermyn's office as general manager so long as he maintained that position, and while he swears he never looked at them—a rather generous denial in view of his official station—and may thereby escape their effect as notice to him individually, yet as part of the transaction with regard to this coal and running through a term of over four years, they are strongly corroborative of McClure's testimony on the subject of the reduction of the royalty and convince us of its truth. Beginning with the coal mined in November, 1887, and extending to that of September, 1891, they show coal accounted for and payments accepted at a royalty sometimes of twenty-five cents but fully as often of twenty.

[This reduction of royalty has a most important bearing on the case. Not only does it meet the objections raised by the master as to there being no adjustment of the royalties, but the defendants claim and McClure so testifies, that it was sought and made as to the tracts now in dispute. The plaintiffs contend on the contrary that it applied merely to the land which the defendants held by their original lease; if confined to the latter it has no further significance than that already given to it, but if it extended to the others it is corroborative evidence of the exchange of the strongest character. How could McClure with the knowledge and participation of Jermyn ask and secure a reduction in the royalty on the coal in dispute except on the basis that he was to mine it? It was not done for Jermyn's benefit, but for his own, and it is the almost undisputed evidence that such was the case. The master himself substantially so finds. He says: "About the first day of October, 1887, a month before the defendants commenced mining the coal in dispute, Mr. McClure and Mr. Jermyn went to New York and interviewed Mr. Potts, president of the New York, Susquehanna and Western Coal Company. Mr. McClure secured from Mr. Potts in the presence of Mr. Jermyn a reduction of

five cents per ton in the royalty on prepared coal in the second or lower vein, with the proviso that this reduction was to be allowed only when the coal brought less than $1.90 per ton. This reduction applied not merely to the coal now in dispute, but to all the coal mined by the defendants in said lower vein."] [4]

Referring again to the monthly statements rendered by the defendants we find them not merely consistent with but strongly corroborative of this position. On their face they gave not only the quantity of coal mined, but the lands from which it has been taken. We have the Erastus Smith, which comprises the main body of the defendants' written lease, spoken of, the Delaware, Lackawanna & Western tract, and in contradistinction to these, the " Coray," or " Coray in fee," which every one in any way ever connected with the mining of this territory testifies was the name given, from Mr. E. A. Coray, the owner, to the Drake and Tedrick tracts, in the royalty accounts. Now by examination of these reports it will be seen that where the royalty is calculated at twenty cents the quantities figured at this price must necessarily include in part at least coal falling under the designation of " Coray " or " Coray in fee." Thus in the report of March, 1890, exhibit 33, there are 1,600 tons at twenty cents, and as there were but 842 tons mined that month from the Erastus Smith, at least 758 tons of this if not more fall under the head of " Coray in fee." Again in the report for the next month, April, exhibit 34, there are 1,518 tons at twenty cents, and only 788 tons from the Erastus Smith, leaving again at least 730 tons to come from the " Coray in fee." Again in the report for May, exhibit 35, there are 2,057 tons at twenty cents, and but 1,153 mined from the Smith, leaving 904 tons at least to come from the Coray; and so on through a score or more. The suggestion that the Winters tract was also known as " Coray in fee " has no significance, because that tract is outside this controversy and the defendants were known to be doing no mining on it. It is true that part of the Drake, which was a " Coray in fee " tract, goes to make up the thirty-two acres on which the Sibley breaker is located and in which the defendants had some workings. But the defendants' rights there are as much contested as they are on the upper end of the Drake or on the Tedrick, so that whether the coal mined and reported

as " Coray in fee " came from the thirty-two acres or beyond them is immaterial; the royalty if reduced on this coal was a reduction on the coal in dispute as much as if it were upon any other part of the contested territory. Nor are these reports, be it noted, brought forward to affect Mr. Jermyn with notice, because he swears he never looked at them; they simply come in as an integral part of the mining of this coal to sustain the testimony of McClure that the arrangement with Potts and Jermyn as to the royalty included the coal which Jermyn in the face of it now claims.

[But there is still other evidence to corroborate the position of the defendants. R. Willis Reese, who has been connected with the mining operations of the Sibley colliery since 1881 under one management and another, and since 1885 has been the defendants' bookkeeper, testifies that in the fall of 1891 he had a conversation with Joseph J. Jermyn, the son of Mr. John Jermyn, and the other member of the plaintiff firm. Reese was tax collector that year of Old Forge township, and Joseph Jermyn, who was making a settlement with the supervisors, came for him to give some information. As they rode together over the Dunn colliery Jermyn said to him, according to his story: " I wish that the dispute of this coal land could be fixed up between McClure and father. They are both getting pretty old. I always understood you were to mine all the coal on this side of the creek," referring to the tracts on the north side of it Joseph J. Jermyn says he does not remember the ride or the conversation, and he is positive he never said what is imputed to him. The master treats this part of the case somewhat peculiarly. Discussing it as a circumstance relied on to corroborate McClure, he says: " R. Willis Reese, an employee of the defendants, testifies that Joseph J. Jermyn, one of the plaintiffs, said to him in the fall of 1891 : ' I always understood that you were to mine all the coal on this side of the creek.' Joseph J. Jermyn denies, however, that any such conversation took place. This circumstance, therefore, is in doubt." That is to say, because Reese testifies one way and Joseph Jermyn the opposite, no consideration is to be given to what the one says more than the other. This, however, is not the way to dispose of such an item of evidence. The master should have decided which he believed

and if it was Reese, in more ways than one the incident was one of great materiality. We have not the advantage which the master had of seeing these witnesses and so judging of their respective credibility, but they are neither of them altogether unknown to us, and perusing their testimony that of Reese carries conviction of its truth. He has no interest to subserve nor any apparent bias other than that he is the bookkeeper of the defendants, while Jermyn is deeply interested as a party and member of the plaintiff firm. Not being hampered by the decision of the master to the contrary we accept the story of Mr. Reese; we certainly would not feel justified in putting it aside as of no consequence simply because it happens to be denied. [5]

If this, which Reese testifies to, took place, it was an admission by one of the parties plaintiff not only going to corroborate the testimony of McClure and the contention of the defendants, but warranting the inference that for himself Joseph Jermyn assented to and accepted the arrangement made by his father by which the creek was to be the dividing line. The master properly holds that John Jermyn could not give away or exchange without the consent of his son and partner, the property of the firm. So that in some way this consent had to be shown. But why does not this concession show it? In the same breath he expresses the very proper wish that the difficulty that had arisen between his father and McClure might be settled because both the parties to it were getting old, and then at once declares that he always understood the line to be at the creek where the defendants now claim it should be. This statement was made not to a stranger but to an employee and agent of the defendants whom he knew to be such, and it is not to be discarded as a casual declaration such as the master is inclined to regard it. On the contrary we think it is evidence of the knowledge of Joseph Jermyn of the arrangement made between McClure and his father and his acquiescence therein.

[Further than that, and bearing on the same subject, the fact that the plaintiffs as a firm still hold to their possession of the seventeen acres below the brook and propose to go right on and take out the coal without accounting or offering to account for it, as John Jermyn declares they do, is itself a confirmation

of the exchange asserted.   Holding on to their end of the bar-
gain in this way they cannot repudiate the other part of it, and
this being the joint act of both partners, both are bound.   Nor
can there be any question as to whether this is done with full
knowledge on the part of Joseph Jermyn, for as John Jermyn
says of the mining of the seventeen acres by the firm, "I didn't
interfere with it; my son had charge."] [6]

Going back to the question of corroboration, one other mat-
ter is to be noted, and that branch of the case will then be
completed.   McClure testifies that Jermyn first interfered with
his mining north of the brook December 21, 1888, when he
got a telephone message from him: "Stop your gangway on
the east; east of your breaker."   This had reference to a
gangway which had been extended into the twenty-one acres
of the Tedrick lying between the Delaware, Lackawanna &
Western and the brook.   McClure told his mine foreman to
stop and taking his mine map come to Scranton.   Meeting
Jermyn he (McClure) told him that this was contrary to their
agreement.   "He looked over the map carefully," says Mc-
Clure, "and said, 'I can get that, you keep above the road.'"
Nothing was said about keeping on the Delaware, Lackawanna
& Western above the road but simply to keep above the road.
Jermyn denies any interview of this sort, and says he first knew
the defendants were mining over on these lands shortly before
he filed the bill, and as that was in April, 1893, this is an asser-
tion that he first knew of it the latter part of 1892 or first of
1893.   But his statements on this point are very general and
indefinite and some of them actually contradictory.   He ad-
mits that he discovered the mining of which he complains a
year or two after 1887, which, if the shorter time be taken,
would bring it 1888, exactly when McClure fixes the stoppage.
Further than that on September 26, 1891, eighteen months
before he filed his bill, he gave the defendants a written notice
to stop, at which time he must of course have known of their
mining.   Statements as to his knowledge, so wide of the mark
in matter of time as these, necessarily weaken what is connected
with them.   As to the conversation about keeping above the
road, it occurred, he says, when McClure wanted leave to make
a sump below it, and he, Jermyn, told him to keep above.   But
the testimony of Judge LEWIS not only throws light, but puts

a different phase on the transaction so touched upon.   He and Rafferty, the treasurer of the New York, Susquehanna and Western, had tried to fix up this matter between Jermyn and McClure, being anxious to have the coal mined out up the mountain, and somewhat doubtful of Jermyn's ability to get it. Some time in 1891, just about the time Jermyn served notice on the defendants to stop mining, Judge Lewis says he had a conversation with Jermyn at his office relative to the stoppage. " I stated," says he, " that Elliot, McClure & Company claimed that they were mining it under an exchange that had been made some time previously, which Mr. Jermyn denied.   My recollection is that I stated to him that it would seem as though there had been an exchange of some sort, because Mr. McClure said he had told him some time before to keep above the road ; that would seem as though it was an exchange.   He said, he (Jermyn) didn't know at that time that it was his coal."   What is this but a confession and attempted avoidance ?   There is no denial in it by Jermyn but that the exchange alluded to had been made, but as a supposed justification for disregarding it he says in effect that he did not know the extent of his own ownership. Not so, however, are agreements to be put aside.   If the exchange was assented to as this admits and the other evidence goes to prove, and it has been duly executed, it is too late to withdraw on a mere suggestion by one of the parties that he did not know what he was disposing of.

The master makes no allusion to the testimony of Judge Lewis, but we cannot believe that he did not take it to be true.   The witness as a former associate judge of this court and subsequent sheriff of the county, stands thus publicly approved, and we must accept his statements as worthy of entire credence.   He was familiar with the subject of the controversy and the parties to it, and interested for the corporation which he represented to have it at an end.   He is not likely, therefore, to have been misled as to what was said nor prejudiced to pervert it.   Taking his story as true, we regard it as confirming in a marked degree the theory of the exchange of coal on which the defendants rely.

[There is one circumstance which it must be conceded does not make for the defendants and in an impartial review of the case it cannot be passed over without notice.   According to McClure's own testimony in December, 1888, when he got his

telephone message to stop his east gangway, he came with his mine map to Mr. Jermyn and after discussing the matter with him was told to keep above the road. Jermyn denies the occurrence but that does not preclude him from relying on it as part of the defendants' evidence. Following this direction McClure stopped his gangway and confined his mining to the territory so indicated. Again in September, 1891, when the written notice was served, the defendants stopped mining on the disputed tracts altogether. "This," says the master, "did not indicate great confidence in their title. They acted rather as though they had a parol license from Mr. Jermyn which was revocable at his pleasure." Superficially it may have this appearance, but we cannot allow it to so dominate and control the whole case as to overcome whatever else there is in it. Nor is the disposition by the defendants to yield to Jermyn entirely inconsistent with their present claim of right. It must be remembered that the direction in 1888 to keep above the road only excluded them from the twenty-one acres of the Tedrick below it, and carried with it all the defendants contend for as to the coal above. Further than that we must look at the whole situation; the entire arrangement for an exchange, as is testified to, grew out of the assumed impracticability of Jermyn getting any of this coal and a consequent concession of it to Elliot, McClure & Company, making a suggestion by Jermyn that he could get out the coal alluded to not out of course and properly to be listened to; the agreement for an exchange rested in parol with Potts, just dead, and Jermyn and McClure, the only living witnesses to it; the relations between the parties, however, continued friendly and intimate, Jermyn still being general manager of the New York, Susquehanna and Western Coal Company, the lessors of the coal, and having more or less authority over the defendants by virtue of that position; nor had possession of the seventeen acres below the brook yet been taken by the plaintiffs leaving the exchange to that extent unexecuted; and last of all the temporary withdrawal by McClure did not necessarily involve an entire abandonment. All these things are to be taken into consideration in deciding on the significance to be given to the action of the defendants and it puts quite a different phase upon them. Moreover, if this matter is to go by acts indicative of confidence or the opposite what shall we say

of the fact that for the full time that defendants were mining on the disputed territory they rendered monthly statements to Jermyn as general manager whether he saw them or not, which on their face without disguise showed that they were taking this coal.

As to the stoppage in the fall of 1891, it was in response to a formal notice which challenged the defendants' entire rights and was the plain precursor of a lawsuit. The defendants might have disregarded it and gone on but they were not bound to do so. It is somewhat perilous to mine coal the title to which is claimed by another, and they wisely stopped and waited. It ought not to prejudice them now that they did. Properly judged in the light of all the circumstances we fail to see in either of these stoppages the expression of such a want of confidence by the defendants in their rights as to overcome the other proofs and carry the case against them.] [7]

[Upon the entire evidence so reviewed we are, therefore, prepared to find the existence of the parol exchange set up in the answer. The master, as we have already said, considered it sustained by the weight of the evidence, but not made out by proofs sufficient to take it out of the statute. We feel compelled to go further and hold it established by clear and convincing evidence such as should satisfy a chancellor. We have not in this discussion lost sight of the plaintiffs' denials nor the effect to be given to them as most plainly appear from our constant references. The defendants are setting up an equity and must make it out the same as though they had filed a cross-bill. In weighing the oral proofs, therefore, the ordinary position of the parties is reversed and the defendants are actors while the plaintiffs stand as it were on the defensive, and are entitled to the conclusiveness of their denials unless overcome by other than the mere oath of the defendants. But giving all the force to this that the plaintiffs are entitled to we hold that there is evidence in abundance to make out the parol agreement for an exchange upon which the defendants rely.] [8]

The only remaining question is whether the exchange was consummated. It is undoubtedly true that an agreement for the exchange of land is within the statute and should be in writing. But the specific execution of a parol agreement for an ex-

change will be decreed in equity the same as a parol sale where it has been so far executed as to make its rescission inequitable: Johnston v. Johnston, 6 Watts, 370. To effect this as to a parol sale, possession must be taken in pursuance of the contract, improvements made, and the purchase money paid in whole or in part; nor must the vendee abandon his possession: Rankin v. Simpson, 19 Pa. 471. But " there is this difference," says AGNEW, J., in Moss v. Culver, 64 Pa. 414, " between a parol sale and an exchange in regard to the requisites to take it out of the statute of frauds and perjuries. A clear, explicit and unambiguous contract and a taking of possession under and in pursuance of the contract are as much requisites of a parol exchange as of a sale. But there is a marked difference in the evidence which establishes the possession. A sale is confined to a subject coming from a single side. It has no relation to or dependence on any other subject. The ̇evidence of possession taken of it is therefore confined to the single subject, and if not taken in a reasonable time or so as to make it doubtful whether it is attributable to the contract, the parol sale is not ̇taken out of the statute. But an exchange necessarily has a subject on each side which stands related to the other. One is the representative of the other, so much so that the law implies a contract of warranty by the act of exchanging. If, therefore, the evidence shows a clear, unequivocal and a complete taking possession of one of the subjects of an exchange by the party owning the other, it strengthens the evidence of a possession taken by the opposite party of the corresponding subject. Evidence of possession that might seem weak and inconclusive in the case of a parol sale is thus made clear and convincing in the case of an exchange." See also Brown v. Bailey, 159 Pa. 121. The master has not kept this difference in mind in the present case in passing upon the question of possession, but has applied to the alleged exchange the stricter rule of a sale ̇; and so far as that has influenced his disposition of the case he has fallen into error.

As we view the evidence there can be no serious question but that the defendants took possession as far as the nature of the property—coal in place under ground—would permit of, nor that they have sufficiently maintained it to the present day. According to the fifteenth finding of the master, immediately

on the agreement for an exchange having been closed, the defendants started from their other workings the proper gangways, airways and headings to reach and get out the coal. Up the mountain they drove a slope on the Drake and cut gangways into that tract and the Tedrick at an expense for the whole of some $20,000. They also extended to the east at an expense of over $2,000 a gangway into the solid coal nearly across the twenty-one acre tract to within eighty feet of its extreme eastern boundary. And from these different openings in the four years and a half that they worked they mined out over 80,000 tons of coal. They also put in mine pumps, pipes and machinery to take care of the water encountered and have been thus involved for pumping in an expense which at the time of the hearing amounted to about $10,000. Unless this pumping be maintained, as of necessity it has so far been, not only these but the other workings of the defendants are in danger of being flooded and drowned out; so much so that in his supplemental report the master modifies his former ruling and permits the defendants to maintain their pumps and pumping machinery in order to protect their general mines. Here then we have possession taken and outlays made on the strength of the parol contract which cannot be justly set aside. The master himself finds that the money expended will be irreparably lost to the defendants if they cannot go on with their mining, and that it cannot be made up to them in damages, a situation which strongly appeals to a chancellor for equitable relief.] [9]

The master considers, however, that there has been a partial abandonment of possession, by the defendants whereby their rights have been lost, because at the bidding of Jermyn in December, 1888, they stopped mining below the road, and again on written notice in September, 1891, they stopped altogether. We cannot accept this conclusion. A mere discontinuance because of a dispute is not necessarily a voluntary abandonment. We have commented upon this phase of the case in another connection and all that is there said may be applied without repetition here. It is to be further noted, however, that while the defendants have not extended their workings since they stopped, they have not failed to maintain the possession taken by means of them. The openings which they made into the disputed tracts are still connected with their shaft and other workings

and their pumps and machinery are still there to take care of the water which gathers in them. Except for the water which has been allowed to accumulate in the east gangway and a readjustment probably of some of their air currents, they could for all that appears go on to-day into any part of this territory to the point to which they had worked and there resume the mining of the disputed coal.

There is another matter which bears upon this question. As early as February, 1891, and perhaps before that, the plaintiffs themselves drove a gangway into and began mining coal from the seventeen acre tract south of St. John's Brook, which the defendants say was given them in the exchange. This was not a mining out of bounds by mistake as the plaintiffs attempt to make it, but on the contrary has much the appearance of an assumption of possession by the plaintiffs of that which had been allotted to them in the exchange. Nearly 6,000 tons of coal have been taken out through these workings, no account of which was ever rendered to the defendants nor any suggestion of payment for it made. Even after the notice to stop was given to the defendants in September, 1891, nearly 500 tons more were mined. And what is still more significant Jermyn admits that they did not give up possession when they found, as he says, that the piece did not belong to them, nor do they propose to do so now. With the plaintiffs holding on to the seventeen acre piece in this way, less evidence, according to the decision made in Moss v. Culver, 64 Pa. 414, and Brown v. Bailey, 159 Pa. 121, supra, will be required to persuade us that the exchange has been consummated and possession maintained on the one side as well as on the other. These considerations lead us to the following result : . . . .

Following these rulings to their legitimate conclusion we dismiss the bill on the merits with costs. Let a decree to that effect be drawn by counsel.

*Errors assigned* were (1) in dismissing bill; (2) in finding that the parties had made a parol exchange; (3–9) portions of opinion as above, quoting them.

*Samuel B. Price* and *Ira H. Burns*, with them *Russell Dimmick*, for appellants.—The evidence in case of a parol exchange

of lands should be clear, precise and indubitable: Brawdy v. Brawdy, 7 Pa. 157; Greenlee v. Greenlee, 22 Pa. 225; Reno v. Moss, 120 Pa. 49; Hess v. Calendar, 120 Pa. 138; Reynolds v. Hewett, 27 Pa. 176; Moss v. Culver, 64 Pa. 414; Brown v. Bailey, 159 Pa. 129; Act of March 21, 1772, 1 Sm. L. 389, sec. 1.

*Everett Warren* and *A. O. Furst*, with them *Edward N. Willard* and *Henry A. Knapp*, for appellees.—There is no difference between a parol sale and an exchange, in regard to the requisites to take it out of the statute of frauds and perjuries: Moss v. Culver, 64 Pa. 414.

Where there is a parol exchange of lands there must be a delivery of possession, but the evidence in reference to the time of possession will admit of greater latitude than in the case of a parol sale of land: Reynolds v. Hewett, 27 Pa. 176; Brown v. Bailey, 159 Pa. 121.

If the evidence of an exchange of lands shows a clear, unequivocal and complete taking possession of one of the subjects of an exchange by the party owning the other subject, it strengthens the evidence, of a possession taken by the opposite party of the corresponding subject: Ott v. Oyer, 106 Pa. 6; Boyertown Nat. Bank v. Hartman, 147 Pa. 558.

PER CURIAM, March 26, 1900:

Having given a most minute and painstaking study to the master's report, and the opinion of the learned court below in this case, we have reached the conclusion that the opinion of the court contains the correct exposition of the facts in evidence and of the conclusions of law which control the determination and application of the facts in view of the various contentions of the parties. The chief controversy upon the question of the parol exchange, as to which the master and the court differ in their conclusions, is in our opinion, clearly and correctly determined by the court. The reasons given in support of that conclusion are entirely satisfactory to us, and without indulging in any repetition of them here we adopt the opinion as the expression of our views upon the whole case and on it we affirm the final decree.

The decree is affirmed and appeal dismissed at the cost of the appellant.