[Civ. No. 14235. Third Dist. Feb. 20, 1975.]

YUBA COUNTY WATER AGENCY, Plaintiff and Respondent, v.
E. R. INGERSOLL et al., Defendants and Appellants.

COUNSEL

Donald E. Huckins for Defendants and Appellants.

Alvin Landis for Plaintiff and Respondent.

OPINION

PARAS, J.—Appellants E. R. Ingersoll and his wife appeal from a judgment of the Superior Court for the County of Yuba entered July 6, 1973, condemning an easement under and across their property for respondent Yuba County Water Agency for the purpose of constructing the Colgate Tunnel (a part of the Yuba River Project). On appeal, they do not contest the award of $100 compensation for the easement; rather they assert that the court erred in not awarding additional compensation for the value of material excavated from the tunnel and used by the respondent in the construction of the Yuba River Development.

The Yuba County Water Agency was established by the California Legislature in 1959 (West's Wat. Code—App., § 84-1 et seq. [Deering's Wat. Code, Act 9407]) to build the Bullard's Bar dam and other facilities

on the Yuba River. As part of that project, it was necessary to run a tunnel 24 feet in diameter and approximately four miles long from the dam to the Colgate Powerhouse through property owned by appellants and others. The easement condemned under the property of appellants consisted of a strip of land 200 feet wide, a minimum of 800 feet below the surface for a distance of 6,494.2 feet.

It was stipulated that on or about April 7, 1967, prior to the extraction of any material from the tunnel, appellants granted a license and right of entry to the respondent to enter upon the land to construct the tunnel. In the course of digging the tunnel, 161,186 cubic yards of rock and material were removed, of which 62,490 cubic yards were crushed and used in the construction of the Yuba River Development.

Although there was testimony that once extracted (at the mouth of the tunnel) the material had a market value of 25 cents per cubic yard (or 13 to 18 cents per ton), the trial court deemed it unnecessary to make a finding on value because of its findings that there was no market for the sale of the material in place (i.e., 800 feet underground), and that the costs of extraction of the material would amount to $20.39 per ton. The court concluded that "the measure of value of the material removed is the value of the material *in place* or the value of the material extracted less the cost of mining, milling, and transportation" (italics added) and therefore, that the net value of the material taken was nothing.

Significantly, appellants did not seek damages for the approximately 100,000 cubic yards of material which were not used in the Yuba River Development, which at the time of trial were "stockpiled" on respondent's property and therefore might have been made available to appellant to replace the material used by respondent. Trial testimony indicated that there was no market for this quantity of material in the area. In fact, the area was so glutted with such tailings that a contractor for the respondent, Perini-Yuba Associates, obtained permission from appellant to dump similar material on other land owned by appellant near the mouth of the tunnel. On cross-examination, appellant E. R. Ingersoll testified that much of this material dumped on his land came from the tunnel (though on redirect examination he insisted that it came from the powerhouse excavation). He said he did not know exactly how much material was dumped on his land. He also testified that he did not really want this other material and had filed a separate lawsuit (of which the trial court took judicial notice) for damages alleged to have been caused by dumping some such material into a lake formed by the river at a certain point on his land.

Appellants raise two issues on appeal: (1) Once the material was excavated from the tunnel, was it the personal property of appellants? We hold that it was not, but that it became the property of respondent. (2) Are the appellants entitled to compensation for the material *used* by the respondent, and if so, how much? We hold that they are not.

Appellants focus on the material *after* excavation, i.e., on the point in time when it became potentially useful. They draw our attention to the *benefit* conferred upon respondent in using the material, and characterize this as a "profit a prendre," for which they should be compensated.

But appellants misstate the issue. The measure of damages when an easement is taken is not the *benefit* accruing to the condemning agency but the *detriment to the remaining property* caused by the easement. (*City of Oakland* v. *Schenck* (1925) 197 Cal. 456, 460 [241 P. 545]; *Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 553-554 [319 P.2d 1033].) Appellants are entitled to damages *to the dominant estate* caused by the removal of the material to excavate the tunnel. They are not entitled to damages for the use by the agency of severed material itself. Any benefit obtained by the respondent from the use of the material is simply irrelevant to the issue. (See *United States* v. *Whitehurst* (4th Cir. 1964) 337 F.2d 765, 771-772.)

Where, as here, the nature of the easement necessitates the physical removal of material from the dominant estate, the value of the material taken is necessarily included in considering the damage to the dominant estate. (*People* v. *Olsen* (1930) 109 Cal.App. 523, 532-533 [293 P. 645]; *Olsen* v. *Great Western Power Co.* (1932) 127 Cal.App. 710, 714 [16 P.2d 347].) If gold had been discovered in the tunnel tailings, making them worth more than $20.39 a ton, appellants would be entitled to the excess over $20.39, but not on the theory of a profit a prendre. Rather, because appellants' dominant estate would be rendered less valuable by the removal of minerals whose value exceeds the cost of mining them.

An analogous situation is presented when a street easement is graded or improved by excavation. The apparent majority rule is that when the materials are removed for the good faith purpose of improving the public way, and not simply for the purpose of using the materials elsewhere, ownership of the material so removed is in the municipality, and it may dispose of it as it sees fit. (3 Nichols on Eminent Domain, § 10.212; *Viliski* v. *City of Minneapolis,* 40 Minn. 304 [41 N.W. 1050]; *Campbell* v. *Monaco Coal Mining Co.,* 39 Ohio Ops. 207 [53 Ohio L.Abs.

481, 85 N.E.2d 138], app. den., 151 Ohio St. 380 [85 N.E.2d 800]; 39 Am.Jur.2d, Highways, § 164; 3 Tiffany, Real Property, § 925.)

Appellants cite several cases to the contrary; *John P. Sharkey Co.* v. *City of Portland* (1911) 58 Ore. 353 [114 P. 933]; *Adams* v. *Harmon* (1928) 124 Ore. 173 [264 P. 356]; *Lyon* v. *Gormley* (1866) 53 Pa. 261 (but see, in regard to *Lyon, Jermyn* v. *Elliott* (1900) 195 Pa.St. 245 [45 A. 938, 941].) An early California case, *McNulty* v. *Lawley* (1919) 42 Cal.App. 747, 750-751 [184 P. 50], approved the majority rule as to grading operations made to improve the road, while finding that other material was wrongfully removed. (See also, *People* v. *Olsen, supra* at p. 532.) We accept this as the law in California. Therefore, by analogy, since the material here was necessarily excavated to dig the tunnel, the water agency became the owner of it and could dispose of it freely.

There is a sound basis in logic and public policy for such a rule. In easements of the sort involved in this case, necessarily some material must be removed to make room for the tunnel, pipeline, or the like. Rarely will the owner of the dominant estate have any use for this material, as its presence obviously distorts the original surface contour. To designate it as the property of the landowner would be to impose upon him the burden of its unwanted presence or the alternative expense of its removal. On the other hand, by giving ownership of such material to the condemner, the landowner suffers the least possible discomfiture; for since the condemner must remove the material (having no right to commit a continuing trespass against the owner), the land will have the same surface utility and external appearance after the work of construction as it had before. Since ownership of the removed material is normally a liability to the condemner, in the rare case where the landowner prefers to keep the excavated material, he will generally have little difficulty in obtaining it at little or no expense to himself. And in the few cases in which the condemner can make valuable use of the material, we conceive of no resulting injustice to the landowner.

The judgment is affirmed.

Puglia, P. J., and Friedman, J., concurred.

On March 4, 1975, the opinion was modified to read as printed above.