UNITED STATES of America, Appellant,

v.

Grayson M. WHITEHURST, Owner of Parcel No. 51, Appellee.

In the Matter of UNITED STATES of America v. 3,380 ACRES OF LAND, MORE OR LESS, PRINCESS ANNE COUNTY, VIRGINIA, and John H. James, et al.

No. 9341.

United States Court of Appeals Fourth Circuit.

Argued April 23, 1964.

Decided Oct. 9, 1964.

---

S. Billingsley Hill, Attorney, Department of Justice (Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis and Marcus L. Beckner, Attorneys, Department of Justice, and Claude V. Spratley, Jr., U. S. Atty., and Franklin C. Baugh, Asst. U. S. Atty., on brief), for appellant.

William L. Parker, Norfolk, Va. (Paul W. Ackiss, Jr., Virginia Beach, Va., on brief), for appellee.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and CRAVEN, District Judge.

BOREMAN, Circuit Judge.

The issues in this case relate solely to the amount of compensation awarded for the taking, in fee, of 273.77 acres of land (hereinafter sometimes referred to as the tract taken, or Whitehurst land or Whitehurst property) required by the United States for the extension of runways at the Naval Air Station between Norfolk and Virginia Beach at Oceana, Virginia. The complaint was filed on July 11, 1951, and an order for possession was entered on the same day. A declaration of taking was subsequently filed on December 29, 1951.

Three commissioners, appointed under Rule 71A(h), Federal Rules of Civil Procedure, to value the tract taken as of July 11, 1951, filed a report and award of $266,400 on March 27, 1963. Objections to the report, filed by the Government and by the landowner, were overruled by the District Court in a short memorandum opinion. Judgment confirming the award was entered and the United States has appealed. We think the award cannot be sustained for the reasons hereinafter stated.

The Naval Air Station was originally constructed during the period from 1942 to 1945. Commencing in August 1950 the runways were extended to accommo-

date jet airplanes. This expansion was the reason for taking the Whitehurst property since one of the runways was constructed and extended thereon. When this expansion work commenced the major portion of the tract taken was being used as a highly productive truck farm along with the adjoining 161.18 acres (not taken) in the same ownership. A "borrow pit" of fourteen or fifteen acres from which fill material and sand had been and were being removed was located on the farm. The bulk of the material from that pit had been used between the years 1943 and 1945 in the original construction of the Air Station and the area was the site of a small asphalt paving plant which had been located there to perform work in connection with said original construction. The plant continued to operate on a small scale thereafter and it also performed work in connection with the expansion project. The total sales of materials from the tract during the 1943–1945 period amounted to $14,923.71, nearly all of said materials being used to meet the demands of the airport project. No other sales were shown until after work had commenced to extend the runways. Four firms which had contracts with the Navy had bought and removed fill and sand from a 65 to 70 acre area near the center of the east side of the Whitehurst land (nine acres of the mentioned fifteen acre borrow pit, excluding the small asphalt plant, were embraced in the tract taken). These materials were purchased to be used in connection with the airport work and the total of all sales of materials from March 20, 1943, to July 11, 1951, amounted to $167,988.63. Thus, as stated, $14,923.71 worth of materials had been sold in the 1943–1945 period for original airport construction, and materials of the value of $153,064.92 had been sold in the 1950–1951 period, again al-

most wholly for expansion of the airport.[1]

The Commission found that the highest and best use of the property taken was for a borrow pit. The District Court stated: "Support for this conclusion was established by a prior use of the property for a brief period of time, together with evidence of a continuing demand for borrow-pit materials in the general area."

There was evidence before the commissioners that the highest and best use of the major portion of the acreage taken was for farming, that other tracts in the area had been sold as farm lands and apparently so valued even though a few of said tracts were later shown by test borings to contain the same underlying materials as the Whitehurst property. Although the Government complains that the Commission refused to find that the property taken could be best used for farming, we think the District Court was justified in upholding the Commission's finding, on the evidence before it, as to the highest and best use. In fact, government counsel conceded, not without reluctance however, during oral argument before us, that there was evidence before the Commission to support its finding of highest and best use.

The principal questions, then, for consideration on this appeal are whether the Commission's award, arrived at by a computation based on estimated sales by the cubic yard of nearly all the soil and subsurface deposits in the tract taken to an average depth of twenty-seven feet over a period of thirty-five years, should have been rejected by the District Court, and whether the report of the Commission is much too inadequate for intelligent review because of a lack of finding on essential issues.

1. The 1943–1945 sales were to T. E. Ritter and E. V. Williams who were contractors for building the Air Station. Witness Bratten testified that, at some time between 1945 and 1951, his firm bought some fill material indirectly, through E. V. Williams (one of the air base extension contractors), from this tract for use in construction of the Virginia Beach Boulevard but he could not show or even estimate the quantity. He stated that proximity to a particular project is a chief factor in determining the source from which such material is obtained.

Mr. Hall, one of the principal witnesses for the Government, appraised the property taken at $156,400. Most of the value was attributed to the major portion of the property on the basis of its existing use as a highly productive truck farm. However, because of industrial potential in the area, he placed additional value on forty-five acres abutting the Norfolk and Southern Railway line which bounded the tract on the north. This included a strip of land 3,000 feet long and 400 feet wide (thirty acres) plus the fifteen-acre borrow pit (nine acres taken) where the asphalt paving plant was located alongside the railroad. He supported his valuation of the farm acreage by citing ten sales of farm land in the immediate vicinity, within five years prior to the taking, which ranged from $43 to $460 per acre. He assigned no value to the use of the tract for a borrow pit (such use being inconsistent with farming or industrial use) and placed a low value ($50 per acre (on the 65 acres which had been so used as compared with his values for the remainder (cleared land $350 per acre, swamp and woods $150 per acre, and industrial $1,000 per acre). He had appraised land which had been sold and which later became borrow pits but he had never appraised a borrow pit, as such, by the cubic yard. He did not, so he stated, concern himself with the material he saw "being carted right across the road to the Navy Air Base."

There was testimony to the effect that, in the immediate vicinity at the time of taking, there were only two borrow pits operating, the one on the Whitehurst land and one on a twenty-acre tract approximately four miles distant, operated by Mr. Baillio "in the Alanton section." One Brown testified that he sold this twenty acres (at about $400 per acre) to Mr. Leeke under the belief that the buyer was going to build a substantial residence on it. However, on the same day, June 15, 1950, Leeke resold it to Baillio who then opened it as a borrow pit. Mr. Brown strongly intimated that he was a victim of misrepresentation and stated that if he had known the twenty acres were about to be resold for a borrow pit he would not have made the sale. He then qualified his statement by saying, "Well, I wouldn't have sold it as fast, and I wouldn't have sold it for the money that I sold it for either." The Commission noted particularly that this sale of the twenty acres was one in which the original seller was not aware of all the facts involved.

For the purposes of this opinion, we think it necessary to present a brief summary of the testimony and evidence before the Commission. As a background for witnesses as to valuation, the landowner offered extensive testimony by engineers and contractors relative to the quantities and types of materials in the property taken, the "market" for such materials and the prices. A topographical map showed the Whitehurst property to have an elevation of from twenty to thirty-one feet above sea level.

Mr. Wilson, a civil engineer, examined the contents of ninety-five borings and, after eliminating swamp and a supporting two-to-one slope that would be needed around the perimeter of the tract to prevent cave-in, estimated that excavation of the tract to an average depth of twenty-seven feet would yield a total of 12,500,000 cubic yards of usable materials—top soil, sandy clay fill and sand.

Messrs. George and Capper, soil testing engineers, described their findings from borings as to quality and depths of the materials. Mr. Capper testified that he would presume that there are other adjacent properties containing a similar type of material and "I don't think that it is confined to his [Whitehurst's] boundaries."

Mr. Hodges, a general contractor, testified that he had searched the area, prior to this taking, for material to fulfill his contracts with the Navy for the Air Station expansion, that he had bought from Whitehurst and if he had not done so he would have had to pay 35¢ per cubic yard at the Baillio pit four miles distant plus 6¢ a mile per cubic yard hauling expense. He paid less than 35¢ per cubic yard to Mr. Whitehurst and stated that

location of the material close to the airport and short hauling were matters of prime concern to him in the cost of materials.

Mr. Llewellyn, a geologist who was employed by a railroad to locate certain materials, stated that the Whitehurst property has an elevation of from twenty to thirty-one feet above sea level, being on the Pungo Ridge (an elevation in the area extending about four or five miles), that it is the only property in the Norfolk-Princess Anne County area containing its soil type *adjacent to a railroad,* and that less than six per cent (8,000 acres) of the land in Princess Anne County contains that soil type. The sandy clay could be used for fill, base stabilization or as one of the components in making material called soil aggregates. The sand could be used for concrete, plastering, traction and other industrial purposes. He noted also that zoning authorities and the public oppose the opening of new borrow pits in the county.

Mr. Williams, a contractor and half-uncle of the owner, testified that the Whitehurst property was a source of fill and subbase material (about eight feet in depth) which met federal and highway specifications and that the location on a concrete road (unlike other pits) made hauling easier. He said he had hauled material out of the tract from 1943 to 1951 "on various projects," "not continuously" but "on occasions." Specifically, however, he named only one occasion in 1943 when he removed 50,000 cubic yards at fifteen or twenty cents a yard *for use on the Air Station,* and another in 1950 or 1951, when materials were used *on the Air Station expansion project.* He could not give any estimate as to the total quantity of material he had removed or the total price paid for it. Nevertheless, he "estimated" that the local annual market in 1951 (excluding government use) was 100,000 cubic yards for highway work, 130,000 cubic yards for other miscellaneous uses and that from sixty to seventy per cent of those needs would have been supplied from the Whitehurst

land. He had "no figures or facts" to support any of these estimates. When asked whether (disregarding government use) he knew "of any time that he [Whitehurst] ever sold in any one year 60 to 70 per cent of 130,000 yards" he replied: "He might have sold to someone else. I don't know." He further testified that the prevailing price of fill in 1951 was twenty cents per cubic yard in the ground. As to sources of the material in the vicinity, he said that in 1951 "we went to Bob Baillio [a pit owner] to try to buy land from him. * * * We have been to different farmers trying. * * * We have been to a lot of people around there. We contacted, diligently as we could, anybody with a closed pit to buy land from if it was for sale. * * * Mr. Whitehurst and Mr. Baillio had the only pits [operating] down there. I have been to other people, asked to buy the land * * *. I was buying it by the yard, if possible. If not, we bought it by the acre."

Mr. Bratten, a paving contractor, stated that the prevailing price in 1951 for fill material that would meet highway specifications was twenty cents per cubic yard for large quantities and up to thirty cents for small quantities. He estimated that the local annual market for road work in 1951 was 100,000 cubic yards, *including* the Air Station, and 50,000 *excluding* it; he thought most of it at that time was coming out of the Whitehurst tract. He said his firm built most of the Norfolk-Virginia Beach Boulevard between 1945 and 1953 and that, prior to July 11, 1951, it had indirectly bought fill from this tract through a subcontractor, Mr. Williams. He did not know the quantity; the boulevard used 15,000 cubic yards of select material per mile; all of it did not come from this property because "there was material in closer proximity to the job than Mr. Whitehurst, which was on the east end."

Mr. Sadler, officer of a ready-mix concrete company, testified that in 1951 five companies in the Norfolk-Virginia Beach area used about 528,276 tons of sand for concrete, masonry and plaster. (One ton

equals two-thirds of a cubic yard.) The major portion of this came from the vicinity of Richmond, Virginia. The rest came from a sand company in Princess Anne County near the Norfolk Airport and 12,500 tons from the Baillio pit. *None of it came from the Whitehurst property.* He did not know how many of those tons were used on the Air Station. In 1951 shipping sand from the Richmond area to Norfolk cost $1.00 per ton by water and $1.13 by rail, and at the same time the hauling cost from the Whitehurst tract to Norfolk would have been 70¢ to 75¢ per ton. On that basis he said: "Of course, it is conjecture but the difference in economics of it, with the proper sales staff, you could sell all of it." He stated that in 1951 processed (washed) plaster sand was selling for 65¢ a ton at the pit and that the Whitehurst sand was worth 7¢ per ton (10¢ per cubic yard) in the ground.

Mr. Mills, officer of a Norfolk company which sold sand for traction, fertilizer-filler and plaster, stated that it sold 1,000,000 tons of unprocessed dune sand in 1951 (purchased from the Government at Fort Story on Cape Henry for 10¢ per ton) ; that the sand from the Whitehurst land was better when processed but they had not bought from this tract in 1951. The dune sand was sold in large quantities to railroads to be used for wheel-traction purposes.

By deposition, over government counsel's objection, Mr. Ritter, a contractor, stated that the Whitehurst property was being used as a borrow pit for the Air Station in July 1951, and that this was its best use. He could not recall having used any of the material for highway work. He tried to buy some of the tract near July 1951 to use for fill *on the Air Station* and offered $2,750 per acre.

Mr. Grice, a valuation witness for the owner, is acknowledged to be an experienced real estate appraiser. He admitted, however, that he had never appraised a borrow pit, that his sole "experience with sand was at a very tender age" and that he derived his information and figures as to market, quantity, quality and price solely from conversations with some of the witnesses in this case and pit owner, Mr. Baillio. He valued the property as a borrow pit. Relying "on other people's judgment" he found no comparable sales.

Mr. Grice valued the Whitehurst land by the following method: He took a total of 12,505,000 cubic yards of salable material, 285,000 top soil, 2,280,000 sand-clay fill and 9,940,000 sand. He estimated the quantity of *sand* that would be sold in a year and divided that into the total quantity of sand available which gave him a 35-year period. Then he assigned thirty-five years to the other two materials, top soil and fill, "to reflect the same period of time." [2] He placed a price of 40¢ per cubic yard on the top soil, 20¢ on the fill and 10¢ on the sand to reach an annual sales return of $43,260 from which he deducted $3,000 as expense for bookkeeping and the payment of taxes, leaving a net of $40,260. Then by the capitalization of income method, using the "Inwood Present Worth Table" on a $40,260 annual income for thirty-five years at the capitalization (risk) rate of ten per cent, he computed a value at the time of taking in round figures of $385,000.

Then, to obtain a value before and after taking for the entire acreage (437 acres) from which this tract was taken, Mr. Grice divided the 277 acres of the taken tract into the $385,000 for a value of $1,400 per acre. He assigned that same value to forty acres not taken and $75 an acre to the remaining 120 acres which were not taken. This gave him a "before taking" value of $450,000. He then subtracted the values placed on the acreages not taken for an "after taking" value of $65,000, arriving again at a damage of $385,000.[3] He stated that he knew of

2. The result was a computation of annual sales of 357,280 cubic yards of all materials.

3. Valuations for the owner were stated by three other witnesses, but since the Commission expressly adopted Mr.

no sales of comparable properties, that is, with comparable soil conditions. He did not consider comparable the sale and resale of twenty acres at $400 per acre (hereinbefore mentioned) which became Mr. Baillio's Alanton pit because Mr. Brown, the owner, did not know he was selling it for use as a borrow pit and because someone told him that the material was not as good as that on the Whitehurst property.

To show that the soil and materials on the Whitehurst land were not unique and could be found in many other places in the county, a soil testing engineer, Mr. Hill, called by the Government, testified that borings at several places to the north and south of the Whitehurst property and thirty-five pits in the area *in 1961* showed that there was plenty of comparable material available in the area.

### Commission's Award

After stating that Mr. Hall was the only witness to testify that the highest and best use of the property, at the time of taking, was for farming, and that none of the witnesses thought any of the sales recited by him were of comparable properties, and rejecting the sale of land for the Baillio borrow pit as comparable because it "was a sale in which the original seller was not aware of all the facts involved," the Commission concluded that the highest and best use of the Whitehurst property, at the time of taking, was for a borrow pit. It reached the further stated conclusion that it was proper "to arrive at the present day worth of the probable net income from the property, over the foreseeable future." It support-

ed its conclusions by "the fact that there is growing public opposition to the use of land for borrow pits," as evidenced by zoning ordinances against them without a special permit and the fact that use of the tract taken as a borrow pit was well established as a nonconforming use which could be continued to its conclusion. It was noted that government witness Hall placed "a value of $1,000.00 per acre on that part of the property, about 15 acres in area, located in the northeast corner of the tract, which was being used as a borrow pit * * *. This was the same rate placed on the railroad property". Then the Commission specifically adopted the method and figures of Mr. Whitehurst's witness, Mr. Grice, in every particular save one; it selected and applied a capitalization (risk) rate of fifteen per cent instead of ten per cent, thus changing the computed value from $385,000 to $226,400, and awarded the latter sum as just compensation.

### Discussion

Generally speaking, in condemnation cases valuation is not a matter of mere mathematical calculation but involves the exercise of judgment.[4] It is well settled and it may be stated without citation of authority that evidence as to top soil and underlying minerals and materials (such as stone, gravel, oil, gas, coal, sand, clay, to name only a few) is not to be ignored but is properly to be considered in determining market value of land. However, land having a sand or gravel content may not be valued on the basis of *conjectural* future demand for it. There must be some objective support for the future demand, including

Grice's method and all of his figures (except the risk rate), the other valuations are relatively unimportant. Mr. Atkinson, a real estate broker, estimated the material could be sold for $1,448,000 and thought the market value in 1951 would have been one-third of that amount, or $428,000. Mr. Ritter valued the tract at $2,750 per acre. Mr. Whitehurst, the owner, asserted a value of $5,000 per acre for 257.65 acres which were not swamp land.

4. Parkbelt Homes, Inc. v. United States, 171 F.2d 230 (4 Cir. 1948); United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 401–402, 70 S.Ct. 217, 94 L.Ed. 195 (1949); Standard Oil Co. of New Jersey v. So. Pac. Co., 268 U.S. 146, 156, 45 S.Ct. 465, 69 L. Ed. 890 (1925); United States v. Brooklyn Union Gas Co., 168 F.2d 391, 398 (2 Cir. 1948).

volume and duration.[5] Mere physical adaptability to a use does not establish a market.[6] *In ascertaining the demand, the requirements of the Government for the project for which the land is taken must be totally excluded.*[7] This requires eliminating from consideration all the material removed from the Whitehurst lands for use on the Naval Air Station in the 1950–1951 period. The past experience of this Whitehurst property, *so far as sales to the Government are concerned,* is irrelevant to a determination of the issue of whether there was any reasonable probability of use in the near future for a borrow pit.

We find this record replete with testimony relying on the sales of materials to the Government, and the Commission made no finding that it excluded or ignored such sales. In relying on Grice, who relied on the opinions of others, who in turn relied to some considerable extent on the government sales, the Commission based its conclusion, at least in part, on the sales to the Government. Moreover, the Commission, by mathematical formula, has valued cubic yards of different materials in the earth on the basis of a demand therefor at the rate of 357,280 cubic yards per year which (eliminating the government's use and purchases of the materials from the taken lands) is unrealistic, speculative and lacking the necessary objective factual support.

The capitalization or interest rate selected and applied in the formula used here reflects the degree of risk in the undertaking involved. It is an extremely important figure in the computation because a change of even a fraction of one per cent will produce a surprisingly material change in the result. In United States v. 158.76 Acres of Land, etc., 298 F.2d 559 (2 Cir. 1962), involving deposits of gravel, the court rejected a valuation based on the capitalization of income theory like the one used here and stated at page 561:

"* * * Capitalization of income comprehends the use of a rate of return in comparable investments. See United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, 407, cert. den. 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855 * * *. There was no testimony whatever about comparable investments. Mr. Chatterton merely used a formula from a handbook of factors for present value of an annuity of $1.00 per year. Nor was there testimony by any witness that a commercial market for gravel would persist for 40 or 60 years."

In the cited Leavell & Ponder, Inc., case, 286 F.2d 398 (5 Cir. 1961), Chief Judge Tuttle wrote at page 407:

"* * * For one to give an opinion on value he is ordinarily required to base such opinion on knowledge of sales at arm's length and without compulsion of comparable properties or on knowledge of the rate of return which the ordinary prudent investor requires in order to invest in a comparable project when he has complete freedom of choice."

\* \* \* \* \* \*

5. United States v. 158.76 Acres etc., in Town of Townshend, etc., Vermont, 298 F.2d 559, 92 A.L.R.2d 766 (2 Cir. 1962); Georgia Kaolin Co. v. United States, 214 F.2d 284 (5 Cir. 1954), cert. den., 348 U.S. 914, 75 S.Ct. 294, 99 L.Ed. 716; United States v. Glanat Realty Corp., 276 F.2d 264 (2 Cir. 1960); United States v. Land in Dry Bed of Rosamond Lake, Cal., 143 F.Supp. 314 (S.D.Cal. 1956).

6. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); Cam-

eron Development Co. v. United States, 145 F.2d 209 (5 Cir. 1944).

7. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); John L. Roper Lumber Co. v. United States, 150 F.2d 329, 330–331 (4 Cir. 1945); United States v. 158.76 Acres etc., in Town of Townshend etc., Vermont, 298 F.2d 559 (2 Cir. 1962); United States v. Rayno, 136 F.2d 376 (1 Cir. 1943), cert. den., 320 U.S. 776, 64 S.Ct. 90, 88 L.Ed. 466.

" \* \* \* Clearly 'capitalization of income' comprehends the use of a rate of return in comparable investments. Evidence of rate of return that is in no way related to a comparable investment does not meet this requirement.

"The absence of any conclusion of value supported by competent evidence in the record requires that the judgment of the trial court be set aside."

Here, Mr. Grice, who had never appraised a borrow pit before, selected a capitalization (risk) rate of ten per cent and stated: "That is based on my judgment and experience." Below are excerpts from the record of his testimony.[8]

The Commission stated in its report:

"On cross examination Mr. Beckner [government counsel] adroitly elicited from the witness [Grice], the fact that only when data, by way of comparable sales is not available, that resort should be had to the income capitalization method, and that the income capitalization method is fraught with danger.

"Mr. Grice admitted that in the words of Mr. Schmutz, one of the leading authorities on condemnation appraisals, 'This method is highly susceptible to overvaluation, because of the tendency to overestimate the number of tons of annual sales and the tendency to employ a capitalization rate that is too low to reflect the hazards of the industry.'"

Despite its observations the Commission proceeded to follow Mr. Grice in all particulars except in his choice of the capitalization or risk rate. The change by the Commission of the rate from ten per cent to fifteen per cent has no support whatever in the record, in comparable investments or otherwise. The only expression of opinion as to this rate was that of Mr. Grice and his testimony flatly contradicts the Commission. When asked concerning the result which would be obtained by using a fifteen per cent risk rate, Mr. Grice said: "Whoever would choose a rate like that, I feel, it is using interest rates rather unintelligently and, I think, unrealistically, too."

We think this record will not support a finding of a "normal demand" from the tract taken of 357,280 cubic yards of top soil, fill and sand per year, commencing July 12, 1951. Eliminating sales for use at the Air Station, the amount of materials sold from this property between 1943 and July 11, 1951, was either very nominal for such a period or evidence thereof was not furnished. A careful analysis of the testimony, even when considered in the light most favorable to the landowner, reveals its insufficiency. Mr. Hodges testified to purchases of material *for use on the Air Station*. Mr. Llewellyn, although seeking material for a railroad, did not testify to any purchases

---

8. "Q. I want to know a comparable gravel pit operation that has reflected this 10 per cent to you. Do you know of any?
"A. No, sir, I do not.
\* \* \* \* \*
"Q. But you had no comparable investment to establish the 10 per cent?
"A. I think you are stretching the point, sir. I feel—
"Q. Name the investment.
"A. A comparable one; no, sir. But it is my opinion that with the risk involved for the period of time you got to invest your money that 10 per cent is not unreasonable. Land downtown, vacant land, will rent for 5 per cent to 6 per cent.

"Q. Is that a gravel pit?
"A. No.
"Q. Borrow pit?
"A. No, sir, I am talking about land.
\* \* \* \* \*
"Q. My question was directed to you on 10 per cent on a borrow pit, if you had any other investment?
[Interruption]—
"THE WITNESS: It has been said twice, sir, that I think it is true that there is no such thing as a true comparable. Everything is comparable to a degree, and trying to take various sales or transactions that I have made myself, transactions that we are all familiar with and trying to come up with a rate."

from this tract. Mr. Williams, although asserting that he had hauled material from this tract from 1943 to 1951 for various projects, testified specifically only as to *purchases for use on the Air Station*. He admitted that his estimate of future sales of materials was not based on facts or figures and his testimony shows that there is like material on other farm lands in the area. Mr. Bratten testified that his firm had used fill from the tract for road work but he neither knew nor estimated the amount. He estimated a 50,000 cubic yard per year market in the area, *excluding the Air Station,* and stated that the proximity of the material source to a job would determine sales. Mr. Sadler testified to purchases of sand from places other than the Whitehurst property and he did not know how much of that was used on the Air Station. Mr. Mills also testified to purchases elsewhere. Mr. Ritter could not recall that he had ever bought material from the tract for highway construction. He tried to buy some of the Whitehurst tract near July 11, 1951, to use for fill *on the Air Station*. Mr. Grice admitted that sales from this tract during the years 1943–1945 totaled $14,923.71 and that all other sales to the date of taking were *to contractors working on the Air Station.*

Although the witnesses emphasized the importance of the location of a borrow pit near the project to be served, there was no evidence of any existing or proposed projects in the reasonably near area except possibly some road work. There is nothing in the record to indicate a tremendous increase in road work as compared to that before 1951 when only a minimal amount of material, as disclosed by the testimony, had been used for this purpose. It would be pure speculation to conclude that road work could establish a constant demand for 357,000 cubic yards of material annually for a period of thirty-five years, having in mind the competition from other pits and other material sources. It is evident that Mr. Whitehurst still has an existing six-acre borrow pit in the land not taken, with an admitted potential supply of materials from at least forty acres, which would compete with the land taken.

The Commission adopted Mr. Grice's thirty-five year period, obtained by dividing his unsupported estimate of the annual sales of sand into the total quantity available and then mathematically applying the resultant thirty-five years to all of the materials. It is obvious that sales of top soil, fill and sand would not run along evenly and it was shown that the sand is at the bottom. This would undoubtedly require expensive shifting and piling or loss of materials. Since the thirty-five year period was computed arithmetically from Mr. Grice's estimate of quantity and market, the adoption of that figure is guesswork and not supported by competent evidence. This will not meet the standards required in arriving at a proper determination of fair market value.

As hereinbefore mentioned, government witness Hall cited ten sales of properties (which he considered comparable) in the near vicinity of the Whitehurst lands which were made within the five-year period before the date of taking. The Commission disregarded this evidence with the following brief comment:

"In each instance he [Mr. Hall] gave dates, the names of the parties involved, the locations of the properties, the character of the farm and soil, the nature of the improvements, their proximity to the subject property and the consideration for each sale, which ranged from $43.00 to $460.00 per acre.

"The Commission does not feel that it would serve any purpose to give the details of each of these transactions."

At least one other witness, Mr. Atkinson, acknowledged that the No. 3 sale listed by Mr. Hall "is pretty near comparable, in my opinion, yes." That property was a mile south of the property taken, fronted on Route 637 with easy access to Route 615 and was on Pungo Ridge. All of the

ten properties cited by Mr. Hall were used for farms, as was the major portion of the Whitehurst land, excluding Navy use. There was evidence that the findings from test borings, made by the government's consulting engineers, as testified to by Mr. Hill (not to be confused with Mr. Hall) showed comparable materials in the area of at least five of Mr. Hall's recited sales. In addition, Mr. Hill found comparable materials in the area of the land sold to Baillio.

The report of the Commission contains no satisfactory explanation for ignoring or rejecting this line of evidence. Possibly the Commission was laboring under the impression that these sales were not comparable because the lands were sold as farm land and not as borrow pits. If so, it was grossly mistaken.

It appears that the Commission and the landowner's witnesses rejected the Brown-Leeke-Baillio twenty-acre sale at $400 per acre because Brown did not know it would be used as a borrow pit. Under the circumstances this was error. All the indicia of an arm's length transaction were present. Mr. Brown evidently received his asking price and there is no evidence that there was a market which would have paid him more. The obvious reason for his statement that he would have demanded more money if he had known that this part of his property was going to be used as a borrow pit was because he did not want a pit next to his residence, just as he had stated that he did not want a cheap housing project there. His reason was personal to him and was not based on any increased value in the land for sale as a borrow pit. The property was not sold with a restrictive covenant as to use and Mr. Brown must have known that, when he parted with title, he parted with control of the use of the property. As the Government asserts: "There is no indication that Mr. Brown or the parties to the other transactions relied upon by the Government's witnesses were all economic idiots and did not know the value of the materials in the lands. The fact that the sales prices do not reflect enhancement because of existence of the materials to an extent even approaching that claimed by Mr. Whitehurst demonstrated that there was no such enhanced value in the market. * * * We think that it is perfectly plain, under the facts of this case, that extensive use to supply non-government sand and gravel demand is merely a figment of the imagination and that it was only thought of because of the existence of a borrow pit created by the Government's demand for the air base next door."

■ It is settled law that comparable sales are the best evidence of value. E.  'g., United States v. Miller, 317 U.S. 369, 374–375, 63 S.Ct. 276 (1943); Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704 (1934); United States v. 5139.5 Acres of Land, in Aiken and Barnwell Counties, 200 F.2d 659, 662 (4 Cir. 1952); United States v. Lowrie, 246 F.2d 472, 474 (4 Cir. 1957); Baetjer v. United States, 143 F.2d 391, 397 (1 Cir. 1944), cert. den., 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618. Real property may be unique and the comparable sales too few to establish a conclusive market price, "[b]ut that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property." United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 402, 70 S.Ct. 217, 221 (1949).

In United States v. Certain Interests in Property, etc., 296 F.2d 264 (4 Cir. 1961), this court upheld the District Court's rejection of the award of a Commission which was based solely upon the opinion of one expert witness, which opinion was found to be without record support and based upon the application of an incorrect test for determining fair market value. That case involved the taking of the owner's equity in a Wherry Housing Act development and the evidence disclosed that the condemned property had an annual *stabilized* income. The capitalization of income method was there applied and approved in determining market value,

the principal issues being the period of remaining economic life of the property and the selection of the proper capitalization (risk) rate. There we used language which may be appropriately repeated here:

"*  *  * However, where the factfinder bases a finding on opinion testimony of an expert witness whose stated reasons for his opinion are patently unsound and without support in the record, the reviewing court should reject, as clearly erroneous, the finding based on such testimony." (296 F.2d at 268.)

We do not hold that the use of the capitalization of income method to determine the value of a borrow pit should be rejected as inappropriate in every case. On the contrary, if all of the factors which must necessarily be taken into account are established by proper evidence, there would appear to be no valid reason to judicially condemn, prohibit or outlaw the use of this method. We do hold, however, in the instant case that the determination of the several elements or factors which were here relied upon was based upon pure speculation and was without objective evidential support.

In United States v. Carroll, 304 F.2d 300 (4 Cir. 1962), the highest and best use for the property taken was found to be as a horse farm with future investment potential. The evidence disclosed that the 268 acres taken were in good condition and included were 150 acres of marketable sod. Although the Commission mentioned the sod it did not expressly indicate in its report whether it had considered the existence of the marketable sod as a factor entering into the determination of the value of the whole tract when put to its highest and best use. This court held that the Commission should reconsider, clarify and correct its report. We there stated (page 306) that the most profitable use to which the land could reasonably be put in the reasonably near future could be shown and considered as bearing upon the market value and, in arriving at market value, there should be taken into account all considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy.

We conclude that the case must be remanded but we are disadvantaged by reason of the fact that the record on appeal does not include a transcript of the instructions of the District Court to the Commission before the latter entered upon the discharge of its official duties. However, from certain reported discussions between the court and counsel, it does appear that the Commission was instructed. It further appears that the Whitehurst property was one of several tracts taken for the Air Station project which were included in the reference to the Commission. It is assumed that the instructions given were acceptable to and had the approval of all parties as no objection thereto has been presented for our consideration. However, since the Commission has erred in the particulars as noted herein, it is suggested that the District Court might well review and refresh its recollection of its instructions given the Commission several years ago with a view to determining whether the instructions were full and complete and whether they were violated by the Commission. It is further suggested that the recent decision of the Supreme Court in United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964), be carefully considered by the District Court. It was there held (page 200, 84 S.Ct. 639) that, on remand, the court, in the exercise of its informed discretion, will determine whether the matters should be resubmitted in whole or in part to the Commission, or whether the court itself should resolve the disputes on the existing record or on the record as supplemented by further evidence.

Reversed and remanded for further proceedings.