942 F.2d 290
 UNITED STATES of America, Plaintiff-Appellant,
v.
69.1 ACRES OF LAND, More or Less, SITUATED IN PLATT SPRINGS
TOWNSHIP, the COUNTY OF LEXINGTON, STATE OF SOUTH
CAROLINA; Heyward G. Robinson, Unknown
Others, et al., Defendants-Appellees,
and
Florence S. Habenight; Betty H. Park; Hermine H. Brown, Defendants.
 No. 90-2215.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1991.
Decided Aug. 15, 1991.
 
 Testimonial evidence supported district court's finding that highest and best use of condemned property was commercial sand mining, rather than rural residential development.
 Albert M. Ferlo, Jr., U.S. Dept. of Justice, Washington, D.C., argued (Richard B. Stewart, Asst. Atty. Gen., Jacques B. Gelin, U.S. Dept. of Justice, Washington, D.C., E. Bart Daniel, U.S. Atty., Wistar D. Stuckey and R. Emery Clark, Asst. U.S. Attys., Columbia, S.C., on brief), for plaintiff-appellant.
 Frank Rogers Ellerbe, III, Robinson, McFadden & Moore, P.C., Columbia, S.C., for defendants-appellees.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and HALL and PHILLIPS, Circuit Judges.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 The United States appeals a condemnation award of $456,900 for 69.1 acres of a 269.1 acre tract of undeveloped land. In particular, it challenges the district court's finding that the highest and best use of the property was commercial sand mining. Because the district court's finding was not clearly erroneous, we affirm.
 
 I.
 
 2
 For many years, the United States has leased 69.1 acres of Sand Mountain in rural Lexington County, South Carolina, for operation of a Very High Frequency Omnidirectional Range, Tactical Air Navigation (VORTAC) station. Sand Mountain is a locally prominent knoll, reaching 410 feet above sea level; the elevation of the surrounding countryside is about 180 feet. The lease expired on March 31, 1987, and the landowner would not agree to the government's offer for a new lease. Hence, the government was forced to file this condemnation action.
 
 
 3
 The subject parcel is part of a larger 269.1 acre tract. Other than the VORTAC station, the property is wooded and undeveloped.
 
 
 4
 A two-day bench trial on just compensation was held. The government presented the testimony of two appraisers, both of whom believed that the highest and best use of the property was for rural residential development. Applying the standard "before and after" method for the condemnation of part of a tract, see Dugan v. Rank, 372 U.S. 609, 624-625, 83 S.Ct. 999, 1008-1009, 10 L.Ed.2d 15 (1963), the government witnesses arrived at figures of $54,000 and $63,100 as just compensation.
 
 
 5
 The landowner presented a different story. He offered evidence that the highest and best use of the 269.1 acre parcel was commercial sand mining, and that the condemned 69.1 acres were the most suitable for that activity. The landowner's witnesses pegged the "before" value at $2,100 per acre for 269.1 acres, or $564,900, and the "after" value at only $540 per acre (with a best use for rural residential development) for 200 acres, or $108,000. The difference between these figures is $456,900.
 
 
 6
 On June 25, 1990, the district court issued an order finding just compensation to be $456,900--the figure requested by the landowner.
 
 
 7
 The government appeals.
 
 II.
 A.
 
 8
 "Just compensation" is that amount of money necessary to put a landowner in as good a pecuniary position, but no better, as if his property had not been taken. Eminent domain is an indispensable means of constructing public improvements. No citizen has a right to thwart the public use through obstinance, or to reap a windfall from the public treasury because his land must be taken. Overcompensation is as unjust to the public as undercompensation is to the property owner. Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897). The burden of proving the value of the land taken is on the landowner. United States ex rel. TVA v. Powelson, 319 U.S. 266, 274, 63 S.Ct. 1047, 1052, 87 L.Ed. 1390 (1943).
 
 
 9
 Most parcels of land are adaptable to several uses, and just compensation is measured by the use that would bring the highest price--the "highest and best" use. In the absence of proof to the contrary, the highest and best use of property is presumed to be its current use.
 
 
 10
 Where a landowner posits that a different use is "highest and best," he must show that this use is "reasonably probable" and that the probability has a real market value.
 
 
 11
 Elements affecting value that depend upon events or combinations of events which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value--a thing to be condemned in business transactions as well as in judicial ascertainment of truth.
 
 
 12
 Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). Where a proffered highest and best use is extraction of some sort of mineral, the landowner must show not only the presence of the mineral in commercially exploitable amounts, but also that a market exists for the mineral that would justify its extraction in the reasonably foreseeable future. United States v. Whitehurst, 337 F.2d 765, 771-772 (4th Cir.1964); St. Genevieve Gas Co. v. TVA, 747 F.2d 1411, 1413 n. 4 (11th Cir.1984).
 
 B.
 
 13
 There is no dispute that the condemned tract has potential for sand mining. A government witness placed the volume of recoverable sand at 6.4 million tons. The largest local sand producing company, Foster-Dixiana, took numerous core samples in the early 1980s. FosterDixiana's president, Mr. Babb, was the landowner's key witness.
 
 
 14
 Babb explained the high quality and quantity of sand on the condemned tract, as had been revealed by the core samples. Sand Mountain is an ancient sand dune that was deposited by the wind. Airborne deposits are cleaner and of higher quality than waterborne deposits. Deposits above, rather than below, local base elevation are easier to mine--the water table is no problem, reclamation is minimal. To mine Sand Mountain would simply be to level it, with a bit of contouring at the end to restore drainage patterns.
 
 
 15
 While the current demands for sand in the Columbia area are being met by existing sources, Babb testified that his company was interested in purchasing reserves for development within the next twenty years, and possibly within the next five years. He testified as to six recent sales of properties in the area for their sand reserve potential. Babb stated that his company would have paid $2,000 per acre for all 269.1 acres had the VORTAC station not been there. He testified that without the 69.1 acres of prime airborne deposit on the mountain, the 200 surrounding acres were much less attractive.
 
 
 16
 The landowner also presented the testimony of a real estate appraiser who set the value of Sand Mountain as a sand-producing property at $2,100 per acre, based on the prices of six comparable sales.
 
 
 17
 The district court found that the landowner had carried his burden of proof that the tract's highest and best use was sand mining. The government challenges this finding on appeal, but it must be affirmed unless clearly erroneous.
 
 C.
 
 18
 The size of this award for a currently undeveloped tract may raise eyebrows, but we cannot conclude that the district court's finding was clearly erroneous. The government makes a single narrow argument--that the landowner failed to prove the existence of a market that would justify opening Sand Mountain as a commercial mine.
 
 
 19
 The government relies on our holding in Whitehurst, 337 F.2d at 771:
 
 
 20
 [L]and having a sand or gravel content may not be valued on the basis of conjectural future demand for it. There must be some objective support for the future demand, including volume and duration.
 
 
 21
 The government asserts that the landowner failed to show the volume and duration of the future demand for sand from the property, and that the district court's highest and best use finding is therefore clearly erroneous.
 
 
 22
 The government has read too much into the passage quoted above, and also takes it out of context. Whitehurst was the government's appeal from an inflated award based on the so-called "royalty" or "income capitalization" method of ascertaining just compensation. This method, disfavored by federal courts,[1] takes a specified number of units of the mineral, multiplies it by projected prices into the future, then discounts the flow of income to a supposed present value. These valuations almost always achieve chimerical magnitude,[2] because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market. As the seminal case on the subject stated, "[i]t would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation." United States ex rel. TVA v. Indian Creek Marble Co., 40 F.Supp. 811, 822 (E.D.Tenn.1941).
 
 
 23
 The Whitehurst court's discussion about "objective" evidence of future demand, including "volume and duration," must be read in the context of the income capitalization method. For a court to allow value to be proved in such a suspect manner, impeccably objective and convincing evidence is required. See United States v. 103.38 Acres, 660 F.2d 208, 214-215 (6th Cir.1981) (approving use of income capitalization method, but remanding for strict evidence of basis in real market).
 
 
 24
 In any event, the landowner does not have to show an imminent demand for the sand from his property. He just has to show that there is a reasonable probability that the sand will be needed and wanted at a near enough point in the future to affect the current value of the property.[3] Babb testified that Foster-Dixiana was engaged in buying reserves now for mining in approximately twenty years. The existence of six other recent sales of properties in the area to sand producers lends further support to the landowner's position that a market exists for minable reserves, notwithstanding that current needs are met from existing mines. The buyers in the sand reserve market are limited to those with foresight and patience, but they are nonetheless real buyers in a real market. The landowner need not prove more.
 
 
 25
 The district court's finding is not clearly erroneous. Therefore, the judgment is affirmed.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 E.g., United States v. Rayno, 136 F.2d 376 (1st Cir.), cert. denied, 320 U.S. 776, 64 S.Ct. 90, 88 L.Ed. 466 (1943); Georgia Kaolin Co. v. United States, 214 F.2d 284 (5th Cir.1954), cert. denied, 348 U.S. 914, 75 S.Ct. 294, 99 L.Ed. 716 (1955); Mills v. United States, 363 F.2d 78 (8th Cir.1966); United States v. 91.90 Acres, 586 F.2d 79, 87 (8th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); United States v. Sowards, 370 F.2d 87, 90 (10th Cir.1966)
 
 
 [2]
 An apt illustration appears in the record. One government appraiser, using the income capitalization approach, calculated a "before" value for the 269.1-acre tract of $1,223,681. The landowner concedes that this "valuation" cannot pass the giggle test
 
 
 [3]
 The $2,100/acre figure, because it is based on actual sales in the area, takes into account the existing reserve supply. If, as the government seems to insist, Sand Mountain sand was needed now or next year, the price per acre would doubtless be much, much more. It is unimportant how far in the future the sand will actually be mined, so long as the mining is foreseeable and lucrative enough that reasonable buyers would consider it in deciding what to pay for the property